IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs January 3, 2018

## IN RE MAYA R. ET AL.

**Appeal from the Juvenile Court for Knox County**
No. 161765     Timothy E. Irwin, Judge

_____

### No. E2017-01634-COA-R3-PT

_____

Mother appeals the trial court's decision to terminate her parental rights to two children on the grounds of (1) persistence of conditions, (2) substantial noncompliance with the requirements of the permanency plan, and (3) failure to manifest an ability and willingness to personally assume legal and physical custody or financial responsibility of the children. She further challenges the trial court's finding by clear and convincing evidence that termination of her parental rights was in the best interest of the children. We reverse in part and affirm in part.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Reversed in Part and Affirmed in Part**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which J. STEVEN STAFFORD, P.J., W.S., and JOHN W. MCCLARTY, J., joined.

Gregory E. Bennett, Seymour, Tennessee, for the appellant, Bettina T.

Herbert H. Slatery, III, Attorney General and Reporter, and Jordan Keith Crews, Assistant Attorney General, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

### OPINION

#### FACTUAL AND PROCEDURAL BACKGROUND

Bettina T. ("Mother") and Richard R. ("Father") are the biological parents of Maya R., born in April 2008, and Nickolas R., born in June 2010. Mother and Father never married, but Father was listed on the birth certificates of both children and he did not dispute being the children's father. Mother also has three older children who are not involved in this case.

The family resided in Ohio until moving to Tennessee in 2011. Mother and Father had a tumultuous, on-again-off-again relationship riddled with domestic violence. While living in Ohio, Mother underwent surgery to have a rod inserted into her arm after Father broke her arm. He also caused injuries to her mouth that required stitches. Before moving to Tennessee, Mother lost custody of her three older children due to domestic violence in the home. She sent two of the children to live with an aunt and uncle in North Carolina. Ohio's child protective agency removed the third child from the home after Mother's family reported that she failed to protect the child from Father. That child was adopted by a family in Ohio. In addition to the domestic violence in the home, Mother had a substance abuse problem. She admitted to using crack cocaine while living in Ohio.

The domestic violence and substance abuse continued when the family moved to Tennessee. The Tennessee Department of Children's Services ("DCS") first became involved with the family in 2014 due to allegations of domestic violence and drug use in the home. DCS investigated the family on six or seven occasions for domestic violence or drug use. In regard to the domestic violence issue, Mother called the police in April 2015 after an altercation between her and Father regarding his use of her car. A few months later, she made Father move out of the home because "he put his hands around her throat." Mother allowed Father to return to the home and, in October 2015, the manager of her apartment complex placed him on the no-trespass list after he caused a domestic disturbance. In January 2016, police responded to yet another domestic disturbance in the home. On this occasion, the altercation between Mother and Father escalated to the point that Mother barricaded herself and the children in the children's bedroom. The police helped Mother and the children escape through a window and transported Father to his sister's residence in Anderson County.

On April 20, 2016, another altercation occurred between Mother and Father. He stole her car after breaking the windshield and repeatedly punching her in the head and face. Nearly a month later, on May 13, Mother filed a petition for an order of protection against Father based on the events that occurred on April 20. In the petition, Mother stated that "[t]here hasn't been a day that I am not scared he will hurt me or get someone to hurt me. [Father] threatened to kill or hurt me everyday." The trial court issued an ex parte temporary order of protection three days later, ordering Father to have no contact with Mother and to immediately move out of the home. On June 23, 2016, the trial court granted Mother an order of protection that was effective until June 22, 2017.

Although the order of protection was in effect, Father contacted Mother on May 31, 2016, requesting a visit with the children. Mother disregarded the order of protection and agreed to meet Father with the children at the auto shop where he worked and temporarily resided in his van. Mother and the children spent the night with him in his van and, upon waking the following morning, Father "began to accuse [Mother] of stealing his crystal-meth." He then stabbed her in the thigh with his pocket knife while

the children were outside playing. Thereafter, he drove Mother and the children to his sister's home and fled the scene. Police arrested Father later that day and charged him with two counts of aggravated assault. After pleading guilty to both charges, he received a sentence of four years, with ninety days to be served in jail.

On June 10, 2016, DCS obtained an ex parte restraining order against Mother and Father. The restraining order prohibited Father from having any contact with the children and ordered Mother not to permit Father to have contact with the children. The trial court scheduled a preliminary hearing on the matter for June 14, 2016, but Mother failed to appear. The trial court found probable cause to believe that the children were dependent and neglected due to "domestic violence in [the] home, substance abuse issues, and inability to provide appropriate care and supervision" for the children and awarded temporary custody of the children to DCS. The children have continuously remained in foster care since that time.

Father was released from jail on August 7, 2016. At the time of his release, he signed a conditional release order mandating that he have no contact with Mother. Shortly thereafter, despite the order of protection and conditional release order, Mother again reunited with Father. Mother met with a DCS case manager on August 22, 2016 to discuss her attending non-offender domestic violence classes. The case manager noted that Mother had a black eye, which Mother reported was the result of her windshield breaking and hitting her in the eye when she drove over a pothole. Two days later, on August 24, 2016, a police officer stopped Father for several traffic violations, and Mother was a passenger in the vehicle. She reported to the police officer that three days earlier, Father "assaulted [her] by striking [her] in the right eye with his elbow." The police officer observed that Mother also had an abrasion inside her left ear. Father was arrested and, on October 28, 2016, he pled guilty to aggravated assault, resulting in the revocation of his probation and a sentence of five years' incarceration.[1]

The trial court held a hearing on September 13, 2016, and on October 25, 2016, it entered an order adjudicating the children dependent and neglected due to Mother's "[a]lcohol and [d]rug issues, her mental health issues, her failure to comply with the [r]estraining [o]rder, and the domestic violence in the home with the father, and failure to provide for the appropriate care and supervision of the children." Mother was allowed supervised visitation with the children. Initially, her visitation was scheduled for once a week for one hour. After she missed some of her scheduled visits, however, she requested that visitation be every other week for two hours because "she felt that might make it so that she was able to attend more visits."

---

[1] Father was incarcerated at the time of trial.

On March 27, 2017, DCS filed its petition to terminate Mother's parental rights.[2] DCS alleged four grounds for termination: (1) abandonment by willfully failing to engage in more than token visitation, (2) persistence of conditions, (3) substantial noncompliance with the permanency plan, and (4) failure to manifest an ability and willingness to personally assume legal and physical custody or financial responsibility of the children. The trial court heard the matter on July 26, 2017, and determined there was clear and convincing evidence to support three of the four grounds alleged: persistence of conditions, substantial noncompliance, and failure to manifest an ability or willingness to assume legal and physical custody or financial responsibility. The court did not find that clear and convincing evidence supported the ground of abandonment by willfully failing to engage in more than token visitation.[3] The trial court then concluded that it was in the best interest of the children for Mother's rights to be terminated. Mother timely appealed.

We consolidate and restate the issues raised by Mother on appeal as follows: (1) whether the trial court erred in finding by clear and convincing evidence that grounds existed to terminate Mother's parental rights, and (2) whether the trial court erred in determining that termination of Mother's parental rights was in the best interest of the children.

STANDARD OF REVIEW

Under both the federal and state constitutions, a parent has a fundamental right to the care, custody, and control of his or her own child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 249-50 (Tenn. 2010); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174-75 (Tenn. 1996) (citing *Nale v. Robertson*, 871 S.W.2d 674, 678 (Tenn. 1994)). Although this right is fundamental, it is not absolute. The state may interfere with parental rights in certain situations. *In re Angela E.*, 303 S.W.3d at 250. Our legislature has identified "'those situations in which the state's interest in the

---

[2] DCS sought to terminate Father's parental rights through separate proceedings, and the trial court consolidated the cases for trial. The record on appeal does not include an order terminating Father's parental rights; however, the trial court issued an oral ruling at the conclusion of the trial stating that the court terminated his rights. He is not a party to this appeal.

[3] Pursuant to the holding of our Supreme Court in *In re Carrington H.*, 483 S.W.3d 507, 525-26 (Tenn. 2016), we must "review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal." We do not interpret *In re Carrington H.* to require us to "review those grounds for termination that the trial court found were not supported by clear and convincing evidence" unless DCS raises an issue on appeal concerning the trial court's ruling that the Department failed to prove one of these grounds. *In re P.T.F.*, No. E2016-01077-COA-R3-PT, 2017 WL 2536847, at *8 (Tenn. Ct. App. June 12, 2017). Therefore, we will not discuss the ground of abandonment by willfully failing to engage in more than token visitation.

welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought.'" *In re Jacobe M.J.*, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013) (quoting *In re W.B.*, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005)). The existence of any one of the statutory grounds will support a termination of parental rights. *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

Because terminating a parent's fundamental parental rights has severe consequences, termination cases require a court to apply a higher standard of proof. *State Dep't of Children's Servs. v. A.M.H.*, 198 S.W.3d 757, 761 (Tenn. Ct. App. 2006). Consequently, a court must determine by clear and convincing evidence both that grounds for termination exist and that termination is in the best interest of the child. Tenn. Code Ann. § 36-1-113(c); *In re Valentine*, 79 S.W.3d at 546. "Clear and convincing evidence 'establishes that the truth of the facts asserted is highly probable, and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" *In re Serenity B.*, No. M2013-02685-COA-R3-PT, 2014 WL 2168553, at *2 (Tenn. Ct. App. May 21, 2014) (quoting *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004) (citations omitted)).

We review the trial court's findings of fact de novo with a presumption of correctness unless the evidence preponderates otherwise. TENN. R. APP. P. 13(d); *In re Serenity B.*, 2014 WL 2168553, at *2. In light of the heightened standard of proof, we must then determine whether the facts, as found by the trial court or as supported by a preponderance of the evidence, establish the existence of one or more grounds for termination by clear and convincing evidence. *In re M.J.B.*, 140 S.W.3d at 654.

ANALYSIS

I. Grounds for Termination

A. Persistence of Conditions

The juvenile court relied on Tenn. Code Ann. § 36-1-113(g)(3) as a ground for terminating Mother's parental rights. This ground is often referred to as "persistence of conditions" and allows courts to terminate parental rights in situations where:

> The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
>
> (A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent or parents or the guardian or guardians, still persist;

(B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or parents or the guardian or guardians in the near future; and

(C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

Tenn. Code Ann. § 36-1-113(g)(3).

We have held that the persistence of conditions ground applies "only where the prior court order removing the child from the parent's home was based on a judicial finding of dependency, neglect, or abuse." *In re Audrey S.*, 182 S.W.3d at 874. At the conclusion of the preliminary hearing on June 14, 2016, the juvenile court issued an order removing the children from the home based on a finding that there was probable cause to believe the children were dependent and neglected due to "domestic violence in [the] home, substance abuse issues, and inability to provide appropriate care and supervision." Although the June 14, 2016 order contains a finding of probable cause that the children were dependent and neglected, it does not contain a finding that the children were in fact dependent and neglected. The juvenile court did not make such a finding until it entered the October 25, 2016 order adjudicating the children dependent and neglected. Thus, for the persistence of conditions ground to apply, the children must have been removed from the home for a period of six months after the October 25, 2016 order. *See* Tenn. Code Ann. § 36-1-113(g)(3); *see also In re Audrey S.*, 182 S.W.3d at 875 (holding that trial court erred in terminating the mother's parental rights on the ground of persistence of conditions because the only order in the record removing the child from mother's custody contained a finding of probable cause that the child was dependent and neglected but contained no finding that the child was in fact dependent and neglected).

DCS filed its petition to terminate Mother's parental rights on March 27, 2017—only five months after the juvenile court made a finding of dependency and neglect. Therefore, the persistence of conditions ground cannot be a basis for terminating Mother's parental rights because the children had not been removed from Mother's home for a period of six months by court order based on a "finding of dependency, neglect, or abuse." *In re Audrey S.*, 182 S.W.3d at 874. Accordingly, the juvenile court erred in relying on Tenn. Code Ann. § 36-1-113(g)(3) as a ground for terminating Mother's parental rights.[4]

---

[4] On appeal, DCS does not defend the trial court's termination of Mother's parental rights on the ground of persistence of conditions, acknowledging that the children were not removed from the home for a period of six months by a court order finding that the children were dependent, neglected, or abused.

B.  Substantial Noncompliance with the Permanency Plan

We next consider the trial court's termination of Mother's parental rights based on her substantial noncompliance with the permanency plan.  Tennessee Code Annotated section 36-1-113(g)(2) allows a court to terminate parental rights where "[t]here has been substantial noncompliance by the parent . . . with the statement of responsibilities in a permanency plan pursuant to title 37, chapter 2, part 4."  To succeed under this ground, DCS must "demonstrate first that the requirements of the permanency plan are reasonable and related to remedying the conditions that caused the child to be removed from the parent's custody in the first place."  *In re M.J.B.*, 140 S.W.3d at 656.  Conditions that make foster care placement necessary may "include conditions related both to the child's removal and to family reunification."  *In re Valentine*, 79 S.W.3d at 547.  The court must then determine whether the noncompliance is substantial.  *In re M.J.B.*, 140 S.W.3d at 656.  In assessing a parent's substantial noncompliance with a permanency plan, the court should measure "both the degree of noncompliance and the weight assigned to that requirement."  *In re Valentine*, 79 S.W.3d at 548.  "Trivial, minor, or technical deviations from a permanency plan's requirements will not be deemed to amount to substantial noncompliance."  *In re M.J.B.*, 140 S.W.3d at 656.

In the case at hand, DCS, with Mother's participation, developed a permanency plan on July 8, 2016, and the trial court ratified the plan on October 25, 2016.  Listing a goal of "Return to Parent," the permanency plan required Mother to (1) complete an alcohol and drug assessment and follow all recommendations, (2) demonstrate sobriety by submitting to and passing all random drug screens, (3) provide prescriptions to DCS and submit to pill counts, (4) refrain from associating with known drug users, (5) complete a mental health assessment and follow all recommendations, (6) sign releases of information to DCS, (7) complete non-offender domestic violence classes, (8) obtain and maintain a legal source of income, (9) comply with all court orders, (10) obtain and maintain a safe and suitable home for the children, (11) pay child support, and (12) have safe and reliable transportation.  DCS revised the permanency plan on March 3, 2017, adding the goal of "Adoption," to which Mother objected.  The trial court ratified the revised permanency plan on April 12, 2017.[5]

The children entered DCS custody due to domestic violence in the home, the parents' substance abuse issues, and the parents' "inability to provide appropriate care and supervision" for the children.  Accordingly, the permanency plan for Mother sought to remedy these conditions.  As the trial court found, the plan requirements were reasonable and related to remedying the conditions that caused the children's removal.

Mother argues that DCS failed to prove this ground by clear and convincing evidence because she substantially complied with the requirements of the permanency

---

[5] The trial court ratified the revised plan after DCS filed the petition to terminate Mother's parental rights.

plan. We respectfully disagree. Mother failed to comply with the permanency plan's requirements relating to her mental health issues. She completed a mental health assessment on July 7, 2016, at Omni Community Health; however, she did not complete the individual therapy and case management recommended by the assessment. Susan Owens, the DCS case manager, testified that DCS provided both of those services to Mother, but she attended no individual therapy and only two case management sessions, which both occurred in July 2016. Mother reported to DCS that she completed a second mental health assessment at Cherokee Health on January 30, 2017. DCS was unable to obtain any information about the assessment, however, because Mother failed to sign a release. In April 2017, shortly after being served with the termination petition, Mother requested another mental health assessment. DCS referred her to Health Connect, where she completed both a mental health assessment and a drug and alcohol assessment on May 26, 2017. The assessments recommended "dual diagnoses intensive outpatient therapy, as well as individual therapy" to address the mental health and substance abuse issues. Ms. Owens testified that these services were available to Mother but, as of trial, she had not begun any of them. During Mother's testimony, she stated that she was attending counseling at Cherokee Health once every two weeks. At the time of trial, she had attended three counseling sessions. When asked what this counseling addressed, Mother responded that "[i]t's basically mental health and non[-]offender domestic violence." She testified that she was scheduled to begin her intensive outpatient treatment one week after the trial.

The permanency plan included several requirements addressing Mother's substance abuse. As mentioned above, Mother completed a drug and alcohol assessment on May 26, 2017, and she had not complied with the recommendations as of trial. Furthermore, she failed to comply with the requirement that she demonstrate sobriety by submitting to and passing random drug screens. DCS began requesting that Mother complete random drug screens as far back as 2014. Ms. Owens testified that, "[o]n several of the occasions [Mother] was unable to produce a sample, and then failed to either come to the Department the next day to do a drug screen or to go to Net Gain the following day." Moreover, Ms. Owens stated that Mother had refused to submit to a drug screen. In February 2017, Mother submitted to a drug screen and tested positive for amphetamine and methamphetamine. When she completed the drug and alcohol assessment on May 26, 2017, she tested positive for alcohol, amphetamine, and methamphetamine. Ms. Owens acknowledged that Mother submitted a negative drug screen on July 11, 2017—fifteen days before trial.

Mother did not comply with the requirement that she complete non-offender domestic violence classes. DCS arranged for Mother to complete the non-offender classes through a therapeutic visitation worker at Omni Community Health; however, Mother refused to complete the program after only two sessions. Ms. Owens testified that Mother complained that the worker was too young and was not qualified to teach the classes because the worker had not been abused. DCS provided Mother with additional

resources to complete the classes, but she never provided proof that she completed counseling elsewhere.

Mother also failed to comply with the requirement that she obtain and maintain a suitable home for the children. Shortly after the children were removed from the home, Mother was evicted from her apartment. Ms. Owens testified that Mother reported to DCS that she was evicted because she allowed Father on the premises after he was placed on the no-trespass list. Thereafter, Mother resided with Father's sister. Following Father's release from jail in August 2016, he began visiting Mother at his sister's home in violation of the order of protection. Consequently, Father's sister informed Mother she could no longer stay at her home. According to Ms. Owens, DCS provided Mother with assistance to find housing, such as giving her information for several shelters she could contact and faxing the children's birth certificates to the housing authority. DCS, in fact, recommended that Mother find housing at the Knoxville Area Rescue Mission ("KARM"). Mother chose not to take advantage of the assistance offered by DCS, choosing to reside with friends or in her car. Mother testified that she chose to stay with friends or in her car rather than entering KARM because she had heard from friends that it "would not be a good place to go" for someone with a prior drug problem. On April 21, 2017, one month after DCS filed the petition to terminate, Mother entered KARM. She testified that she had applied for public and private housing and hoped to secure housing a couple of months after trial; however, at the time of trial, she still resided at KARM, which she described as "dangerous" and plagued by "[s]hootings, stabbings, ODs, needles all over the place, [and] any drug you want."

Finally, Mother complied with the requirement that she obtain a legal source of income; however, she did not do so until two months after DCS filed the petition to terminate. She testified that she began working at the University of Tennessee Conference Center on May 16, 2017. She worked between thirty and thirty-four hours per week.

We have previously recognized that a parent's efforts to comply with a permanency plan after the filing of a petition to terminate can be "too little, too late." *In re A.W.*, 114 S.W.3d 541, 546-47 (Tenn. Ct. App. 2003) (holding that, although the mother's condition improved upon taking medication for her mental health issues, her efforts came "too little, too late" because she refused to take the medication until two months before trial); *see also In re Malaya B.*, No. E2015-01880-COA-R3-PT, 2016 WL 3083045, at *5 (Tenn. Ct. App. May 24, 2016) (holding that the mother's efforts to comply with the permanency plan were "too little, too late" because she only made efforts to address her mental health issues after the filing of the termination petition); *In re Emily N.I.*, No. E2011-01439-COA-R3-PT, 2012 WL 1940810, at *16 (Tenn. Ct. App. May 30, 2012) (holding that "the Parents' refusal to complete a number of the requirements until after the termination petition was filed . . . was simply '[t]oo little, too late.'"). Here, although Mother completed some of the requirements of the permanency

plan by the time of trial, the proof showed that she made no real effort at compliance until after DCS filed the petition to terminate. We conclude, therefore, that there is clear and convincing evidence that Mother did not substantially comply with the permanency plan.

### C. Failure to Manifest an Ability and Willingness to Personally Assume Custody

The trial court also relied on Tenn. Code Ann. § 36-1-113(g)(14) as a ground for terminating Mother's parental rights.[6] Pursuant to this ground, a court may terminate parental rights in situations where:

> A legal parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child.

Tenn. Code Ann. § 36-1-113(g)(14). Essentially, this ground requires DCS to prove two elements by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c)(1), (g)(14). First, DCS must prove that Mother failed to manifest "an ability and willingness to personally assume legal and physical custody or financial responsibility of the child[ren]." Tenn. Code Ann. § 36-1-113(g)(14). DCS must then prove that placing the children in Mother's "legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[ren]." *Id.*

In the present case, Mother failed to manifest an ability to personally assume legal and physical custody of the children because she was living an itinerant lifestyle, residing with friends or in her car, at the time DCS filed the termination petition. Her housing situation changed a few months before trial when she entered KARM. She testified, however, that KARM was "dangerous" and rife with "[s]hootings, stabbings, ODs,

---

[6] Mother cites to Tenn. Code Ann. § 36-1-113(g)(9)(A)(iv) in reference to this ground for termination. Mother is correct that the grounds in subsection (g)(9) do not apply to her because they apply to putative fathers. *See* Tenn. Code Ann. § 36-1-113(g)(9). It is clear from the record, however, that the trial court relied on Tenn. Code Ann. § 36-1-113(g)(14) as a ground for terminating Mother's parental rights, not (g)(9). The trial court's order tracks the language in subsection (g)(14) verbatim. Moreover, at the beginning of the trial, the court repeated the grounds alleged by DCS, stating as follows:

> And finally, the kind of catchall ground, the new ground, failed to manifest by act or omission an ability and willingness to personally assume legal and physical custody or financial responsibility of the children, placing the children in [Mother's] legal and physical custody would pose a substantial risk of harm to their physical and psychological welfare.

Subsection (g)(14) became effective on July 1, 2016. Thus, it is the "new ground" to which the trial court referred. *See* 2016 TENN. PUB. ACTS Ch. 919 (S.B. 1393).

needles all over the place, [and] any drug you want." Additionally, Mother failed to manifest a willingness to personally assume legal and physical custody of the children: she completed virtually nothing required by the permanency plan until after the termination petition was filed. Moreover, by the time of trial, she still had not secured housing, completed non-offender domestic violence classes, or completed the recommendations of her mental health and alcohol and drug assessments.

With respect to the second element, placing the children in Mother's custody would pose a risk of substantial harm to the physical or psychological welfare of the children. We have made the following observations about what constitutes "substantial harm":

> The courts have not undertaken to define the circumstances that pose a risk of substantial harm to a child. These circumstances are not amenable to precise definition because of the variability of human conduct. However, the use of the modifier "substantial" indicates two things. First, it connotes a real hazard or danger that is not minor, trivial, or insignificant. Second, it indicates that the harm must be more than a theoretical possibility. While the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.

*Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001) (footnotes omitted).

Mother has an extensive history of domestic violence and substance abuse. A thorough examination of the record shows that she has barely begun to address these issues. Mother has a pattern of separating from and then reuniting with Father. She has attended a few therapy sessions at Cherokee Health for mental health and non-offender domestic violence; however, she has not completed the non-offender domestic violence classes or any alcohol and drug treatment or the recommendations of her mental health and alcohol and drug assessments. Since DCS became involved with the family in 2014, Mother has only submitted one negative drug screen—a mere fifteen days before trial. Moreover, we find it significant that Mother has denied that she has a substance abuse issue. She contends that testing positive for amphetamines and methamphetamines only twice does not make her an addict.

In light of the foregoing, removing the children from their current home and placing them back in Mother's custody would expose them to a substantial risk that Mother will fail to obtain or once again lose suitable housing or expose the children to drug use or domestic violence. We, therefore, conclude that DCS proved by clear and convincing evidence that Mother failed to manifest an ability and willingness to assume custody or financial responsibility of her children and that placing them in her care would pose a risk of substantial harm to their physical or psychological welfare.

## II. Best Interest

Having determined that clear and convincing evidence of at least one statutory ground exists to terminate Mother's parental rights, we must next consider whether the trial court properly determined that termination of Mother's parental rights is in the best interest of the children. *See* Tenn. Code Ann. § 36-1-113(c)(2); *In re Audrey S.*, 182 S.W.3d at 860. After a court finds that clear and convincing evidence exists to support a ground for termination, the child's interests diverge from those of the parent and the court focuses on the child's best interests. *In re Audrey S.*, 182 S.W.3d at 877. A court must view the child's best interest from the perspective of the child, not that of the parent. *Id.* at 878. A finding that at least one ground for termination of parental rights exists does not necessarily require that a parent's rights be terminated. Because some parental misconduct is redeemable, our termination of parental rights statutes recognize that "terminating an unfit parent's parental rights is not always in the child's best interest." *Id.* at 877.

When considering whether terminating a parent's rights to a child is in the child's best interest, a trial court is to consider the following non-exclusive factors:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i). A trial court is not required to find that each of the enumerated factors exists before concluding that it is in the best interest of the child to terminate a parent's rights. *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005).

Here, the trial court found that the best interest factors weighed in favor of terminating Mother's parental rights. Specifically, the court found that "[Mother] has not made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the children's best interest to be in her home despite reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible." *See* Tenn. Code Ann. § 36-1-113(i)(1), (2). DCS assisted Mother in reunification by scheduling visits with the children, giving her information for several shelters, and faxing the children's birth certificates to the housing authority. DCS further assisted Mother by providing, referring, or otherwise ensuring that she had access to the following services: (1) a mental health assessment, (2) mental health case management, (3) an alcohol and drug assessment, (4) drug screens, and (5) non-offender domestic violence classes. Despite the availability of these services, Mother failed to complete several of the permanency plan's requirements addressing the conditions that caused the children's removal. For instance, substance abuse remained an issue because she had not completed any alcohol and drug treatment and tested positive for amphetamine and methamphetamine two months prior to trial. In fact, since 2014, Mother only submitted one negative drug screen—fifteen days before trial. The domestic violence issue also remained unresolved because Mother maintained a relationship with her abuser until his current incarceration began in August 2016—two months after the children's removal—and failed to complete non-offender domestic violence classes.

The trial court also found that Mother failed to maintain regular visitation with the children. *See* Tenn. Code Ann. § 36-1-113(i)(3). Between December 2016 and March 2017, Mother had the opportunity to visit the children once every other week for two hours. She missed four of the nine visits. Mother explained that she missed those visits

because her car was impounded but, by the time of trial, she was attending visitations because she had learned to use the bus system. The evidence in the record, however, shows that, while Mother did visit the children, she continued missing visits after DCS filed the termination petition. She, in fact, missed two visits approximately one month before trial.

In addition, the trial court found that "a change of caretakers and physical environment is likely to have a detrimental effect on the children's emotional and psychological condition." *See* Tenn. Code Ann. § 36-1-113(i)(5). The children were placed with their current foster family two months prior to trial. According to the foster mother, she and her husband have the resources to care for the children and are open to adopting the children should they become available for adoption. The foster mother testified that, when the children arrived at her home, Nickolas was behind in school and was unable to read two-letter words. The foster parents worked with him on his reading and he was reading short stories by the time of trial. In addition, upon arriving at the foster parents' home, Nickolas displayed aggressive behavior towards Maya and the foster parents' biological son. Specifically, he placed his hands on their throats when they irritated him. The foster mother stated that her husband talked to Nickolas about his behavior and things "[had] been improved tremendously."

The trial court found that Mother "has shown neglect toward the children and has exposed them to the brutality, physical, emotional or psychological abuse inflicted upon her by their father due to her failure to separate from him." *See* Tenn. Code Ann. § 36-1-113(i)(6). A thorough examination of the record shows that Mother exposed the children to her abusive relationship with Father and that she repeatedly reunited with him, despite obtaining an order of protection against him.

The trial court also found that the physical environment of Mother's home was not healthy or safe for the children. *See* Tenn. Code Ann. § 36-1-113(i)(7). The trial court stated as follows: "The Court cannot find that KARM [is] not a healthy and safe physical environment. We do not remove children from their families just because they are living at KARM. On the other hand, it is not a permanent home and [Mother], herself, believed it to be unsafe." The record supports this finding because Mother testified that KARM was rife with "[s]hootings, stabbings, ODs, needles all over the place, [and] any drug you want." The court then found that Mother's substance abuse problems may render her consistently unable to care for the children in a safe and stable manner. *See* Tenn. Code Ann. § 36-1-113(i)(7). As discussed in more detail above, the evidence shows that Mother had barely begun to address her substance abuse issue by the time of trial.

Finally, the trial court found that Mother failed to pay child support consistent with the child support guidelines. *See* Tenn. Code Ann. § 36-1-113(i)(9). The record contains no evidence pertaining to whether Mother paid child support once the children

- 14 -

were removed from the home.  Thus, we cannot conclude that the record supports the trial court's finding as to this factor.

In light of the foregoing, we conclude that there is clear and convincing evidence to establish that termination of Mother's parental rights is in the best interest of the children.

CONCLUSION

The judgment of the trial court is reversed in part and affirmed in part, and this matter is remanded with costs of appeal assessed against the appellant, Bettina T., for which execution may issue if necessary.


_____
ANDY D. BENNETT, JUDGE